**25-2053**

# United States Court of Appeals

*for the*

# Fourth Circuit

**ROGER C. DAY JR.,**

*Relator-Appellant,*

**v.**

**THE BOEING CO., et al.**

*Defendants*

**UNITED STATES OF AMERICA,**

*Intervening Plaintiff-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**BRIEF OF RELATOR-APPELLANT ROGER DAY**

Elliott M. Harding, Esq.,
Harding Counsel, PLLC
2805 Meadow Vista Dr.
Charlottesville, Virginia 22901
(434) 962-8465
Elliott@HardingCounsel.com

*Counsel for Relator-Appellant*

# Table of Contents

TABLE OF AUTHORITIES .......... ii
STATEMENT OF JURISDICTION .......... 1
STATEMENT OF THE ISSUES .......... 1
STATEMENT OF THE CASE .......... 2
I. The Alleged Fraud .......... 2
II. The Government's Intervention and Motion to Dismiss .......... 4
III. The June 2024 Opinion .......... 5
IV. The October 29, 2024 Hearing .......... 6
V. The April 2025 Dismissal .......... 7
VI. This Appeal .......... 9
SUMMARY OF THE ARGUMENT .......... 10
STANDARD OF REVIEW .......... 12
ARGUMENT .......... 12
I. The District Court Erred When It Held That It Does Not Have The Authority To Order Independent Counsel .......... 12
A. Due Process Requires Disinterested Prosecution .......... 13
B. The District Court Had Authority To Require Appointment Of Disinterested Counsel .......... 22
II. The Relator's Due Process Rights Have Been Violated .......... 27
A. Polansky Reserved The Constitutional Question .......... 27
B. The Government's Investigation Was Inadequate .......... 29
C. The District Court Applied An Incomplete Framework .......... 32
III. The District Court Erred By Dismissing Without The Attorney General's Written Consent Per § 3730(b) .......... 35
IV. The District Court Erred On Rule 9(b) Grounds .......... 39
CONCLUSION .......... 40
CERTIFICATE OF COMPLIANCE .......... 41

CERTIFICATE OF SERVICE ........................................................ 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Association of American Railroads v. U.S. Dept. of Transportation,*
821 F.3d 19 (D.C. Cir. 2015) .................................................... 19, 20

*Berger v. United States,*
295 U.S. 78 (1935) .......................................................................... 13

*Brotherhood of Locomotive Firemen & Enginemen v. United States,*
411 F.2d 312 (5th Cir. 1969) ........................................................... 14

*Buckley v. Valeo,*
424 U.S. 1 (1976) ............................................................................ 21

*Carter v. Carter Coal Co.,*
298 U.S. 238 (1936) ............................................................ 18, 19, 20

*Clackamas County, Ore. v. McKay,*
219 F.2d 479 (D.C. Cir. 1955) ......................................................... 16

*Cohens v. Virginia,*
19 U.S. (6 Wheat) 264 (1821) .......................................................... 17

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.,*
508 U.S. 602 (1993) ......................................................................... 15

*Kendall v. United States,*
37 U.S. 524 (1838) ........................................................................... 17

*Marshall v. Jerrico, Inc.*,
446 U.S. 238 (1980) .......... 10, 14, 31, 35

*National Treasury Employees Union v. Nixon*,
492 F.2d 587 (D.C. Cir. 1974) .......... 16

*Steel Co. v. Citizens for a Better Environment*,
523 U.S. 83 (1998) .......... 35

*United States ex rel. Day v. Boeing*,
No. 3:23CV371,
2024 WL 2978469 (E.D. Va. June 13, 2024) .......... 29

*United States ex rel. Doe v. Credit Suisse AG*,
117 F.4th 155 (4th Cir. 2024) .......... 28

*United States ex rel. Michaels v. Agape Senior Cmty., Inc.*,
848 F.3d 330 (4th Cir. 2017) .......... 12

*United States ex rel. Polansky v. Executive Health Resources, Inc.*,
599 U.S. 419 (2023) .......... 9, 10, 11, 27, 28, 31

*United States v. Day*,
No. 3:07-cr-154 (E.D. Va.) .......... 3

*United States v. Klein*,
80 U.S. (13 Wall.) 128 (1872) .......... 17

*United States v. Sigillito*,
759 F.3d 913 (8th Cir. 2014) .......... 11, 14, 32

*Yee v. City of Escondido*,
503 U.S. 519 (1992) .................................................................. 35

*Young v. United States ex rel. Vuitton et Fils S.A.*,
481 U.S. 787 (1987)...................................................*passim*

**Statutes:**

U.S. Const. Art. II, § 3 ............................................................ 16, 21

10 U.S.C. § 3204 .................................................................... 18, 21

28 U.S.C. § 516 .......................................................................... 24

28 U.S.C. § 517 .......................................................................... 24

28 U.S.C. § 519 .......................................................................... 24

28 U.S.C. § 1291 .......................................................................... 1

31 U.S.C. § 3729 ...................................................................... 1, 39

31 U.S.C. § 3730 ...................................................................... 1, 12

31 U.S.C. § 3730(b)(1)................................................ 17, 35, 36, 37, 38

31 U.S.C. § 3730(c)(2)(A) ....................................................... 5, 37, 38

**Rules:**

Fed. R. App. P. 32(a)(5)-(7)........................................................... 41

Fed. R. Civ. P. 9(b)............................................................ 7, 8, 12, 39, 40

Fed. R. Civ. P. 59(e) ........................................................................ 9, 35

Fed. R. Civ. P. 60(b) ........................................................................ 5

Virginia Rule of Professional Conduct 1.7(a) ........................................ 33

**Other Authorities:**

John T. Boese & Douglas W. Baruch, Civil False Claims and Qui Tam Actions § 4.05[A][1] (6th ed. 2025) ................................................ 29

30 Moore's Federal Practice § 808.33[3] (2026) ..................................... 23

9 Wright & Miller's Federal Practice & Procedure § 2364 (4th ed. 2022) ............................ 26, 31

## Statement of Jurisdiction

The district court had jurisdiction to consider the case pursuant to 31 U.S.C. §§ 3729, 3730. This Court has jurisdiction to consider this appeal pursuant to 28 U.S.C. § 1291.

## Statement of the Issues

I. Whether the district court erred when it held that it does not have the authority to order the United States to appoint an independent counsel and remove the Attorney General and Department of Justice as representative counsel for the United States due to a conflict of interest.

II. Whether the Relator's due process rights have been violated by the district court's granting of the Government's motion to dismiss without recognizing the constitutional exception that *Polansky v. Executive Health Resources, Inc.* expressly acknowledged.

III. Whether the district court erred when it granted the United States' motion to dismiss and denied the Relator's motion filed pursuant to Fed. R. Civ. P. 59(e) in spite of the Attorney General having not filed a written consent with a statement of reasons as required per 31 U.S.C. § 3730(b).

IV. Whether the district court erred by dismissing on Rule 9(b) grounds.

## Statement of the Case

### I. The Alleged Fraud

The Relator, Mr. Roger C. Day Jr., alleges that five of the largest defense contractors[1] in the United States have knowingly participated in a procurement scheme involving false claims that has been facilitated by the Defense Logistics Agency ("DLA") since as early as 2003. In a hearing before the district court, the Department of Justice ("DOJ") conceded that the practice alleged is as Mr. Day describes.

The scheme works as follows: the DLA purchases replacement parts for previously sole-sourced military vehicles through the Defense Internet Bid Board System ("DIBBS"). The replacement parts at issue have only one manufacturer, the originally sole-source provider, and therefore they have only one source.

When only one source exists, federal regulations require the United States and the respective contractor to proceed via federally mandated sole-source procurement procedures, including written justification and price reasonableness determinations. These regulations include

[1] Boeing, Lockheed Martin, Raytheon, General Dynamics, and Northrup Grumman

statutory and regulatory limitations on the margins that the provider can receive. Nevertheless, by placing the request for bids, contracts, and purchases of these replacement parts on the DIBBS system, the DLA effectively labels these as "competitive" bids though no actual competition is possible. The defendants know this, they know their parts are sole-sourced, and they know the request for bid or proposal is defined in a manner by which these contractors are the only source of the materials requested. This process comes in violation of federal law and allows contractors to knowingly evade price scrutiny and limitations, thereby resulting in astronomical overcharging to the Government. This has been taking place for over two decades and has unlawfully come at the expense of the American taxpayer to the tune of hundreds of billions of dollars. JA9-10.

Mr. Day is an insider to this system, albeit in a unique fashion. He was convicted in 2007 of wire fraud for a parts substitution scheme. He formed shell companies, bid on DLA contracts through DIBBS via algorithmic and automated systems, and ultimately delivered nonconforming or inferior parts. *See United States v. Day*, No. 3:07-cr-154 (E.D. Va.). He is serving a statutory maximum sentence of 105 years.

Ironically, while engaging in the activity that resulted in his conviction, he discovered the scheme at issue in this case when his autonomous bid system submitted a bid on a seemingly-competitive contract to provide replacement parts that were actually incapable of being provided by anyone other than the sole-source of the original vehicles. A representative from the DLA office in Richmond, Virginia contacted him, asking him why he bid on the contract because it was not possible for anyone else but for the original provider to be able to fulfill the terms. This raised his suspicions because DIBBS is a competitive bid system—why would the DLA say no third party is able to fill the contract as a matter of fact? His suspicions were confirmed via years of research into the practices and then, ultimately, by the Government when it conceded as much in this case.

This case concerns *procurement classification fraud*, or "false claims," in that the defendants are knowingly submitting bids as "competitive bids" for what they know are, in-fact, sole-sourced parts and this comes outside of the legal framework and regulatory requirements. As Mr. Day's counsel told the district court, Day's "use of the system

revealed the means by which this process is taking place, but his conduct did not involve" the scheme he attributes to the defendants. JA278.

The FCA exists to incentivize insiders, including those with checkered histories, to expose false claims that jeopardize the trust and solvency of the United States. These relators have congressionally vested "rights" in the qui tam process. Day's familiarity with DIBBS enabled him to identify the scheme and that familiarity came at a cost but does not negate the veracity of his allegations or the ongoing injury to the coffers of the United States.

**II. The Government's Intervention and Motion to Dismiss**

The United States intervened in this action, but not to prosecute the claims or seek redress for the defendants' receipt of astronomically higher margins that the law allows. Instead, it intervened to dismiss the claim via 31 U.S.C. § 3730(c)(2)(A), which permits the Government to seek dismissal of a qui tam action over a relator's objection.

Mr. Day opposed dismissal and moved to remove the United States as a party or, alternatively, for the district court to order the appointment of an independent counsel outside of the Department of Justice to handle the case. He argued that the Department of Justice's adoption and

defense of the DLA's violation of federal procurement law creates a disqualifying conflict of interest. The Complaint alleges DLA contracting officers knowingly participate in the scheme, JA10, and the same DOJ that represents the DLA moved to extinguish claims involving the Government's own misconduct.

### III. The June 2024 Opinion

The district court initially dismissed the case without a hearing and Mr. Day moved to vacate the order via Fed. R. Civ. P. 60(b), arguing the Government failed to satisfy *Polansky*'s requirements for dismissal over a relator's objection and that a hearing is required when an objection is raised. The district court agreed. In a June 13, 2024 Memorandum Opinion, the court found the Government's showing "skimpy" and its assertions "undocumented" and "conclusory." JA42-43. The court held that the Government had committed "a fundamental mistake of law" by failing to satisfy *Polansky*'s limited requirements. JA43. The court rejected the Government's characterization of the complaint.

> Nor did the United States explain in detail (or at all) why it had come to believe that the suit had little chance of success on the merits. Indeed, the Government completely mischaracterized the nature of the Relator's COMPLAINT by arguing that the COMPLAINT did not assert any false claims. To the contrary, the COMPLAINT quite clearly alleges false

> claims by the Defendants. Worse still, it alleges that the Government procurement agencies were knowingly complicit in the making of the false claims that were alleged.
>
> JA42.

The court vacated the dismissal and ordered a hearing as statutorily required.

## IV. The October 29, 2024 Hearing

At the hearing, the district court pressed the Government on whether it investigated whether the DLA's use of the DIBBS system was as Mr. Day described.

> THE COURT: This is simple to investigate. If I had been getting a complaint like this and it said you're using this system and you're doing it knowing it's illegal, the first thing I would have investigated is, well, is that system illegal as the complaint alleges? And you're telling me that the Department of Justice did not even look at that issue.
>
> JA306.

Government counsel admitted, "We did not recite that in our papers, Your Honor." JA307. The court took a one-hour recess so the Government's counsel could determine what investigation actually occurred and when the court reconvened, Government counsel described the inquiry. He had read the complaint and concluded it failed to state a claim, then "talk[ed] to the associate general counsel and the senior

associate general counsel at DLA." JA312 The DLA's lawyers "confirmed" that the practices described were "entirely consistent with the way they secure their parts" but they considered this practice "perfectly legitimate." JA312. The Government's "investigation" thus consisted of asking the complicit agency whether its relevant practices are as described and whether they consider it to be a problem. The DLA confirmed the former and denied the latter. On that basis, the Government moved to dismiss.

The Government conceded that the DIBBS system operates exactly as Day alleges. Counsel stated that DLA confirmed "they do have, in some cases, one approved source" and that "there is kind of a limited source for where the parts can be obtained." JA312. This is the definition of "sole source" and the Government did not dispute Day's factual allegations. It conceded the DLA operates as Mr. Day described. Its only defense was that this conduct is "perfectly legitimate" as a matter of law, because it says so. Finally, when the court asked about Rule 9(b), Government counsel disclaimed reliance on that ground.

> THE COURT: Well, you cite the inadequacy—you cite the inadequacy of the pleading under Rule 9(b). Does Rule 9(b) apply to circumscribe whether a false claim has been properly pleaded or not?

> MR. MCINTOSH: I would not rely on 9(b) in this case, but certainly if it got to the point where the defendants were served, in my opinion, it would be a slam dunk for the defendants to have the case dismissed on Rule 9(b).

JA320.

**V. The April 2025 Dismissal**

The district court granted dismissal on March 31, 2025 with an accompanying Memorandum Opinion issued on April 2, 2025. The court denied Day's motion to remove the United States' counsel, holding that the FCA's text does not authorize a relator to remove the United States as a party or the Attorney General and Department of Justice as counsel once the Government intervenes. Notably, the court acknowledged discomfort with this result:

> The Court has some concern that the rule ought to be otherwise where, as here, it is alleged that the United States and contracting party defendants have conspired and colluded in the making of false claims. But here the allegations of conspiracy and collusion are too conclusory and general to present the need to decide the issue whether there is a conflict and, if so, what affect it may have.

JA157 n.11.

The court did not consider *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987), which provides the framework for analyzing institutional prosecutorial conflicts. It did not consider its

supervisory authority to ensure disinterested prosecution of the laws and it did not consider whether the Government's admissions supplied the non-conclusory facts demonstrating a conflict of interest. Despite the Government's disclaimer at the hearing, the court also dismissed the case on Rule 9(b) grounds. The court attempted to reconcile this with its earlier finding that the complaint "quite clearly alleges false claims."

> It is clear for the reasons set forth above that Day's COMPLAINT fails to meet that standard, notwithstanding the Court's prior statement that the COMPLAINT "quite clearly alleges false claims by the Defendants." ... Therefore, the Court sees no inconsistency in previously having stated that the COMPLAINT "quite clearly alleges false claims by the Defendants" while simultaneously holding today that the COMPLAINT lacks sufficiently particularized facts to allege that false claims have occurred that meet Rule 9(b)'s heightened pleading standard for fraud claims.

JA207 n.26.

This dismissal came with prejudice, extinguishing Mr. Day's claims without any opportunity to amend the complaint to address the Rule 9(b) ground the Government itself had disclaimed. Mr. Day moved for reconsideration under Rule 59(e), which the district court denied on August 21, 2025. JA233.

**VI. This Appeal**

Mr. Day timely appealed. He argues that the district court erred when it held that it does not have the authority to provide the relief he sought and also violated his due process rights by deferring to a conflicted Government's motion to dismiss without recognizing the constitutional exception *Polansky* itself acknowledged. He also argues that the court erred by dismissing on Rule 9(b) grounds the Government itself disclaimed. The Government has not challenged the factual record from the October 2024 hearing. Its admission that the investigation was "not extensive," that it consisted of consulting DLA's own lawyers, the Department of Justice represents the DLA, and that the DLA operates the DIBBS system exactly as Day alleges are undisputed. The Supreme Court in *Polansky* expressly reserved "the circumstances in which, or procedures by which, a court should find the Constitution to prevent the Government from dismissing a qui tam action" because the relator there "ha[d] not raised a claim of that sort." 599 U.S. at 436 n.4. Day has raised precisely that claim.

## Summary of the Argument

In *United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419 (2023), the Supreme Court expressly reserved the question of when "bedrock constitutional constraints" prevent the Government from dismissing a qui tam action and declined to answer the question because the relator had not raised a constitutional claim. *Id.* at 436 n.4. Mr. Day raised precisely such a claim and this appeal asks the Court to reverse the district court's order finding that it does not have the authority to order an independent counsel due to a conflict of interest and apply the constitutional exception *Polansky* acknowledged.

Due process and the court's supervisory authority require those who act in the name of the United States to be disinterested. The decision in *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987), established that courts have supervisory power to ensure disinterested prosecution in the Government's name. In *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980), the Court held that schemes that intertwine personal or institutional interests into enforcement decisions violate due process by introducing "irrelevant or impermissible factors" into prosecutorial judgment. When an actual conflict infects a prosecution, the error is

fundamental and requires no harmless error analysis. *United States v. Sigillito*, 759 F.3d 913, 928 (8th Cir. 2014).

Here, the Government's conflict is not hypothetical. Mr. Day alleges that the DLA, the agency that administers the DIBBS procurement system, was knowingly complicit in the fraud. The Government's pre-dismissal "investigation" relied on asking the DLA's lawyers whether the DLA did anything wrong. The DLA said no. That was the investigation. The Government's counsel admitted that this inquiry was "not an extensive investigation." This is precisely the danger *Young* identified, namely discretionary prosecutorial decisions made outside judicial supervision and infected by institutional self-interest.

The district court never considered this framework and analyzed individual attorney conflicts under state ethics rules rather than institutional conflicts under *Young*. The district court never cited *Young*, addressed the court's supervisory authority, or considered the constitutional exception *Polansky* expressly reserved. The district court's analysis asked the wrong question and the result was a dismissal that the court itself viewed with "some concern," as it was reached without the doctrinal tools to act. JA157 n.11.

The district court also erred by dismissing on the same Rule 9(b) grounds that the Government itself disclaimed. At the hearing, the Government's counsel stated he "would not rely on 9(b) in this case." JA320. Six months earlier, the same court found that Day's complaint "quite clearly alleges false claims by the Defendants." JA42. The court dismissed on Rule 9(b) anyway, offering a strained explanation that "the Court sees no inconsistency" between finding a complaint "quite clearly alleges false claims" and dismissing it for failure to plead with particularity. JA207 n.26. Mr. Day asks this Court to vacate the dismissal and remand for evaluation of the Government's motion, free from the institutional conflict that infected the proceedings below. He does not seek removal of the United States from this action altogether, but only a mechanism to ensure the decision is made by actors without an interest to bury a federal agency's misconduct.

## Standard of Review

The interpretation of 31 U.S.C.S.§ 3730 presents a pure question of law, and the appellate court's review is de novo. *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 336 (4th Cir. 2017).

## Argument

**I. The District Court Erred When It Held That It Does Not Have The Authority To Order The United States To Appoint An Independent Counsel and Remove The Attorney General and Department of Justice As Representative Counsel For The United States Due To A Conflict of Interest.**

**A. Due Process Requires That Those Who Act In The Name Of The United States Be Disinterested And Courts Have Supervisory Authority To Ensure Disinterested Prosecution.**

The principle is foundational—those who exercise authority in the name of the United States must pursue justice rather than victory and must adhere to the laws of the land.

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest . . . is not that it shall win a case, but that justice shall be done.

*Young*, 481 U.S. at 803 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

This obligation has a constitutional dimension and Justice Blackmun, concurring in *Young*, wrote that due process "requires a disinterested prosecutor with the unique responsibility to serve the public, rather than a private client, and to seek justice that is unfettered." *Id.* at 814–15 (Blackmun, J., concurring). The majority acknowledged

this due process theory without rejecting it, noting that the Fifth Circuit had "characterized" the appointment of an interested prosecutor "as [a] due process violation." *Id.* at 808 n.19 (citing *Brotherhood of Locomotive Firemen & Enginemen v. United States*, 411 F.2d 312, 319 (5th Cir. 1969)). The majority relied on supervisory authority only to "avoid the necessity of reaching any constitutional issues." *Id.* at 809 n.21. In this case, the Attorney General and Department of Justice represent the Department of Defense and DLA, thereby creating an non-waivable and fundamental conflict of interest.

Although *Young* was decided in the criminal context, its reasoning applies equally to civil enforcement. The danger of conflicted discretionary decisions infecting the record exists whenever someone exercises prosecutorial authority in the Government's name. The danger of conflicted representation is that it infects discretionary decisions with "irrelevant or impermissible factors." As the Court explained, quoting *Marshall v. Jerrico*:

> [A] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision.

*Id.* at 807–08 (quoting *Marshall*, 446 U.S. at 249–50).

This concern is structural. A conflicted counsel's discretionary judgment, including "the determination of which persons should be targets of investigation, what methods of investigation should be used," and "whether any individuals should be granted immunity," "are all made outside the supervision of the court." *Id.* at 807. Because these decisions "go to shape the record in a case, but few of which are part of the record," any "inquiry into a claim of harmless error . . . would require . . . unguided speculation." *Id.* at 812–13. Because the harm is structural, the error is fundamental. When an actual conflict infects the defense or prosecution of the law, the error "undermines confidence in the integrity" of the proceeding and requires reversal without harmless error analysis. *United States v. Sigillito*, 759 F.3d 913, 928 (8th Cir. 2014) (quoting *Young*, 481 U.S. at 810). "Because of the fundamental nature of this error," the Eighth Circuit held, "we do not conduct a harmless-error or prejudice analysis." *Id.*

The Supreme Court has repeatedly emphasized this principle, observing that justice "must satisfy the appearance of justice, and this stringent rule may sometimes bar trial [even] by judges who have no actual bias and who would do their very best to weigh the scales of justice

equally between contending parties." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 618 (1993) (quoting *Marshall*, 446 U.S. at 243). When the Government moves to dismiss and defend against allegations that involve its own complicity in a scheme, justice cannot satisfied but is mocked.

The foremost duty of both the district court and a United States Attorney is to adhere to the Constitution of the United States of America. Any and all authorities are derived via Articles II and III of the Constitution and these may not run contrary to Constitution. When one Department of a coequal branch of government or agency thereof is admittedly violating its sworn duty to the Constitution and the governing laws promulgated by Congress while simultaneously violating the Constitutional Due Process rights of an American citizen, the district court must act to prevent the violation of the Constitution. Under such circumstance, the court not only has the jurisdiction to disqualify the Department or agency for conflict of interest, it has the obligation.

The constitutional duty obligating the president to Take Care the Laws be faithfully executed does not permit the President to refrain from executing laws duly enacted by Congress as those laws are construed by

the judiciary. *See National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974). Nothing in the Constitution allows the President the ultimate authority to construe federal statutes and Article II requires the President to "take Care the Laws be faithfully executed...." U.S. Const. Art. II, § 3. That duty does not allow the Executive Branch to affirmatively flout laws duly enacted by Congress.

To contend that the obligation imposed on the President to see the laws faithfully executed implies a power to violate them is a novel and impermissible construction of the Constitution. The judiciary has the constitutional duty to require the executive branch to remain within the limits stated by the legislative branch. *Nixon*, at 604. Executive officers cannot create an area of doubt and dispute which outside of the established power of the judiciary to compel obedience to the clear mandates of Congress. The Department of Justice and the DLA cannot lift themselves out of the jurisdiction of the court by their own manufactured bootstraps. *Id.*, *see also, Clackamas County, Ore. v. McKay*, 219 F.2d 479, 495 (1955).

The U.S. Attorney for the Eastern District of Virginia and its assistants derive their power and obligation to faithfully execute the laws

enacted by Congress from Article II authority. In *Kendal v. United States*, 37 U.S. 524 (1838), the Court unequivocally stated it is an "obligation imposed on the President to see the laws faithfully executed does not [even] imply power to forbid their execution." *Id.*, at 613. Neither the Attorney General, the Department of Justice, the United States Attorney for the Eastern District, nor the DLA have more power than the President to decide that laws can be violated and they are all under the same obligation to execute the laws enacted by Congress as the President is himself.

The Government admitted that it is participating in the scheme as described in Mr. Day's Complaint and the Department of Justice is effectively defending these violations of duly enacted procurement laws by acquiescing to the practices and seeking to dismiss the case. The remedy the Relator sought in the district court would not require the judiciary to undermine the respect otherwise due to its coordinate branches of Government. To the contrary, as a court's failure to exercise its jurisdiction would disrespect legislative authority under Article I, § 1 of the Constitution and be constitutionally improper.

In *Cohens v. Virginia*, 19 U.S. (6 Wheat) 264, 404 (1821), Chief Justice Marshall stated:

> It is most true, that this court will not take jurisdiction if it should not; but it is equally true, that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by, because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur, which we would gladly avoid, but we cannot avoid them. all we can do is, to exercise our best judgment, and conscientiously to perform our duty * * * Moreover, judicial resolution of the issue better enables the President to perform his constitutional duty to take care that the laws be faithfully executed. No lack of respect is shown the executive merely because this Court has executed its duty to interpret a statute differently than has the President. Indeed, failure to determine the law because the executive has spoken would seem a nonperformance of duty by the judiciary.
>
> *Id.*, *see also United States v. Klein*, 80 U.S. (13 Wall.) 128, 143-47 (1872).

The record below clearly shows that by joining with the DLA and its attorneys, the DOJ has decided to "catch and kill" this case while fighting against the requirement of § 3730(b)(1)'s Attorney General specific consent with reasoning. At the same time, referring to all the

allegations set forth in the amended complaint, the Government brazenly stated as follows:

> More importantly, even if DLA's procurement methods did not comply with the Federal Acquisition Regulation[s] DLA is fully aware of its own systems, policies and methods.

Document 29-1, at p. 11

The admission that the DLA has implemented its own system to foster the defendants' looting of the United States Treasury should have put the lower court on immediate constitutional vigil. This type of statement, this admission implicates the Due Process Clause on at least two levels, the Appointments Clause, and with the DOJ's AUSA proffering this position as a considered justification and argument of behalf of one of the largest ongoing frauds, in terms of dollars and duration, obligation to Take Care the laws be faithfully executed.

The Government's "own" "systems, policies and methods" that violate the entire category of Federal Regulation known as the Federal Acquisition Regulations (FARs) admittedly confer power to the Defendants to implement a necessary governmental function by allowing the Defendants as private companies to regulate their competitors by completely eliminating them from all competition, in an inherently

competitive bidding procurement system, while simultaneously allowing these same private companies to charge the DLA whatever they want for their products thereby fleecing the Treasury, is the anathema to the "very nature of things." *Carter v. Carter Coal Co.* 298 U.S. 238 (1936).

Instead of actively working to prevent an ongoing series of false claims by the Defendants and take care the laws be faithfully executed, the DOJ is defending the DLA and compromising neutrality and adherence to the law while working intolerable and unconstitutional interference in violation of due process at the expense of public trust and property. This inherently demands judiciary action and the courts always have jurisdiction to ensure the judicial process adheres to due process.

The Constitutional violations before the lower court are several and exponential. First, the DLA via the DOJ admitted that it has adopted the unpublished, unpromulgated policies that Mr. Day alleges. These "systems, policies and methods" were developed in secret and have been enacted in violation of Congressional mandates and thereby the Constitution. DLA must propose regulatory change in accordance with statute and cannot set up an entire set of occulted systems, policies and methods applicable only to a select sub-set of self-interested, private

contractors for the purpose of excluding all competition for these private parties in violation of 10 U.S.C. § 3204 and corresponding Title 41 statutes. Second, these systems, policies and methods that only are applied to and only for the Defendants violate the due process of all potential contractors to DLA as they authorize economically self-interested actors (the Defendants) to regulate (by elimination) their competitors.

Only Congress can make the laws, not the DLA with the DOJ's acquiescence. Laws result in regulations that are adopted via due process, proposal, publication, public commentary, etc. The DLA's "own" "systems, policies and methods" violate an entire category of duly enacted regulations (FARs) that the DOJ is allowing, resulting in the Treasury being looted by the Defendants and the simultaneous representation of the DLA and intervention in this qui tam action presents an actual conflict of interest that directly violates the Relator's Due Process rights as vested by Congress via the False Claims Act.

The DOJ's attorney stated its position—because DLA has these "systems policies and methods" and it is aware of the, it is permissible. This, instead of the derivative absolute constitutional obligation from the

President himself under Article II to "take care the laws be faithfully executed." It is unconstitutional for the DLA to develop and enact unpublished unpromulgated "systems, policies and methods" that violate duly enacted statutes and regulations to financially benefit a small group of specific contractors. No appointed "officer" of the federal government can do this and there are no codifications of these special "systems, policies and methods." The abstract legal question at the heart of this case is whether it violated due process for the DOJ to defend the DLA's decision to give self-interested entities the authority to eliminate their competitors and then intervene to dismiss this case. The Supreme Court confronted a similar question in *Carter v. Carter Coal*. This case dealt with the invalidation of act of Congress that empowered one set of competitors to regulate a rival set. 298 U.S. at 311-13. This decision predates the Administrative Procedure Act and the Court's modern administrative law jurisprudence.

*Carter Coal* involved a challenge to the Bituminous Coal Conservation Act, which prohibited the United States or any other contractor from purchasing bituminous coal from a mine that did not comply with certain wage and hour requirements. The Act itself did not

articulate those requirements and delegated the authority to determine them to the "producers of more than two-thirds of the tonnage for the preceding calendar year" and "more than one-half the mine workers employed" *Id.* at 310. Simply put, the Act endowed these majority producers and employers with the authority to set the wage and hour requirements the minority producers and employers had to comply with or else forfeit all their customers. This forced the minority producers "to accept in these circumstances [was] not to exercise a choice, but to surrender to force." *Id.* at 311. The provision "subjected the dissentient minority . . . to the will of the stated majority" and conferred on that majority "the power to regulate the affairs of [the] unwilling minority." *Id.* Disapproving the scheme, the Court reasoned: This legislative delegation in its most obnoxious form; for it is not even delegation to an official or official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business. *Id.* "At first blush, it's not clear precisely which aspect of the delegation offended the Court. By one reading, it was the Act's delegation to "private persons" rather than official bodies. By another, it was the delegation to persons "whose interests may be and

often are adverse to the others in the same business" rather than persons who are "presumptively disinterested" as official bodies tend [are supposed] to be. *Association of American Railroads v. U.S. Dept. of Transportation, et al.*, 821 F.3d 19, 28-29 (D.C. Cir. 2015) (interpreting *Carter Coal*). The difference between being a producer of product to be purchased and a regulating the production of said product is fundamental. The former is a private activity, the latter is necessarily a governmental function since one person may not be entrusted with the power to regulate the business of another, and especially of a competitor. A statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property. *Id.* "Accordingly, the Court invalidated the Act as "so clearly a denial or rights safeguarded by the due process clause of the Fifth Amendment." *Id.*

On the record, and much more serious a violation than *Carter Coal*, or *Assoc. of Amer. Railroads*, this case is not about a duly enacted statute that overtly, but mistakenly and unconstitutionally, delegated governmental power to private companies. This is the occulted creation of ultra vires "systems, policies and methods" that allow private

companies to completely eliminate their competition while massively financially benefiting from the "policy" of the removal of "sole-source" pricing controls and the DOJ is allowing it. The Defendants know that every time they submit a bid through DIBSS, the DLA's "own" "systems policies and methods" will be applied in violation of the law and they will be protected from all competition. The DLA knows these systems are being used every day and the Government knows the Defendants are knowingly submitting false claims for payment to the Defense Finance and Accounting Service through these illegal "methods." Instead of faithfully executing the laws as required by Article II, the DOJ joins the DLA and these Defendants. This is the definition of a conflict of interest.

The violation of the Appointments Clause, at issue here, is just one of the results from DLA making up its "own" rules for a selected group of private companies in violation of the law. The Appointments Clause requires every "Officer of the United States" exercising "significant authority pursuant to the laws of the United States" to be appointed in a specific manner as prescribed by Article II, section 2, clause 2. *Buckley v Valeo*, 424 U.S. 1, 126 (1976). The key to this is "significant authority pursuant to the laws of the United States." DLA contracting officers are

not appointed to exercise the ultra vires authority to create "systems, policies and methods" that violate 10 U.S.C. Section 3204 and the FARs. The Constitution's drafters may not have foreseen the formidable prerogatives of the administrative state but the Due Process Clause guarantees the regulatory power of the federal government will be wielded by "presumptively disinterested" and "duly appointed" actors who in exercising the awesome power of the Government are beholden to no constituency but the public good. The Defendants, as economically self-interested actors, transgress that vital guarantee.

### B. The District Court Had Authority To Require Appointment Of Disinterested Counsel And Erred By Concluding Otherwise.

The district court concluded it lacked authority to remedy the conflict as presented. That conclusion rested on an incomplete analysis failing to recognize its fundamental, supervisory authority, as applied in *Young*, or the constitutional exception acknowledge in *Polansky*. The district court also understood the remedy that was requested, thereby preserving this issue for review.

At the hearing, Judge Payne posed a hypothetical. "[S]uppose the United States were to say, 'Okay, we're going to put this to rest. The DOJ

is out of the case and we're hiring Smith & Jones as the law firm to represent the United States.'" JA290. He recognized such an appointment would cure the conflict. "You can't remove the United States from the case if that happened, could you? Because the conflict would be gone." JA290. Mr. Day's counsel agreed. JA290. The court grasped the problem, understood the solution, but concluded that it could not order the remedy as a matter of law. That conclusion was wrong and is reversible error. *Young* established that federal courts possess inherent authority to ensure disinterested representation for prosecution of law.

> While it is true that Federal Rule of Criminal Procedure 42(b) does not provide authorization for the appointment of a private attorney, it is long settled that courts possess inherent authority to initiate contempt proceedings for disobedience to their orders, authority which necessarily encompasses the ability to appoint a private attorney to prosecute the contempt.
>
> *Id.*, 481 U.S. at 793–94.

The *Young* Court grounded this authority in the judiciary's need for self-protection. Without it, courts would be "mere boards of arbitration whose judgments and decrees would be only advisory." *Id.* at 796. Leading treatises confirm this principle. Moore's Federal Practice explains that when ordinary prosecutors are unavailable, federal courts

possess "inherent authority to appoint a private attorney to prosecute," and that such appointees "must be as disinterested as a traditional prosecutor" because "[t]he disinterested prosecutor requirement ensures confidence in the fairness of such contempt proceedings and prevents an appearance of impropriety." 30 Moore's Federal Practice § 808.33[3] (2026).

*Young* counsels that courts should ordinarily refer matters to the United States Attorney and "appoint a private prosecutor only if that request is denied." *Id.* at 801–02. This "least possible power" principle presumes a disinterested United States Attorney's Office but when the prosecuting authority is conflicted because it must consult and defend the allegedly complicit agency, the rationale for deference disappears. The court's supervisory authority becomes the "last resort" that *Young* contemplated. The district court acknowledged at least some inherent authority. In footnote 20, it wrote that the court "maintains its authority to remove individual Government attorneys . . . in the unique and special circumstances where the individual may possess a conflict of interest." JA179 n.20. the district court cabined its authority to *personal* rather than *institutional* conflicts under ethics rules. The district court never

considered whether the same authority, or its broader supervisory authority that *Young* describes, extends to institutional conflicts affecting the exercise of prosecutorial discretion.

The district court's statutory analysis was beside the point. Judge Payne relied on 28 U.S.C. §§ 516, 517, and 519, which vest litigation authority in the Attorney General. JA169-173. The court concluded these statutes foreclose any alternative to DOJ representation but those statutes allocate executive authority, they do not strip judicial supervisory authority. *Young* recognizes the judiciary's inherent authority exists independent of statutes allocating prosecutorial functions. The statutes tell us who normally represents the United States, they do not tell us what happens when the normal representative is disqualified by conflict.

The separation of powers concern is similarly misplaced. Judge Payne worried that limiting DOJ's role would "strip the Executive Branch of any control" over qui tam litigation. JA175–176. He relied on circuit decisions upholding the FCA's constitutionality because the Executive retains control through DOJ. But those cases assume the DOJ acts as a disinterested guardian of the public fiscal interest. They do not

address, and cannot foreclose, judicial intervention when the DOJ's control is the constitutional problem.

Mr. Day does not seek removal of the United States from this action outright. He does not ask this Court to override prosecutorial discretion generally or compel the Government to prosecute. He seeks only a mechanism to ensure that if the Government exercises its dismissal power, that decision is made by counsel free from the institutional conflict that due process and *Young* forbids. That is a gatekeeping function, not a prosecutorial one. The remedy Mr. Day requests is narrower than what *Young* even authorized. In *Young*, the Court permitted courts to appoint private attorneys to prosecute contempt on behalf of the United States. Mr. Day asks for less, namely appointment of disinterested counsel to evaluate whether dismissal is warranted. If *Young* authorizes the greater power of prosecution, it necessarily authorizes the lesser power of independent assessment. At the hearing, counsel outlined precisely this remedy. The court could "order the United States to remove the Department of Justice and present an independent counsel or special counsel within a certain period of time." JA291. The Attorney General would retain ultimate authority over who serves, while

the court would simply require that whoever serves be free from the disqualifying conflict. That approach respects executive prerogatives while ensuring the dismissal decision satisfies constitutional requirements. *Polansky* supports this remedial flexibility. The Court recognized that the FCA's hearing requirement gives district courts authority to structure proceedings, observing that "the district court must use that procedural framework to apply Rule 41's standards." 599 U.S. at 436. And in applying Rule 41, courts must "endeavor to ensure that substantial justice is accorded to all parties." *Id.* at 437 (quoting 9 Wright & Miller's Federal Practice & Procedure § 2364, at 554 (4th ed. 2022)). A court cannot ensure substantial justice by deferring to a Government whose "investigation" consisted of asking the allegedly complicit agency to clear itself. When deference would produce injustice, the court must have tools to ensure justice is done. The district court had those tools but without precedent or this Court's guidance, it simply did not recognize them.

## II. The Relator's Due Process Rights Have Been Violated By The District Court's Granting of The Government's Motion to Dismiss Without Recognizing The Constitutional Exception That *Polansky v. Executive Health Resources, Inc.* Expressly Acknowledged.

### A. *Polansky* Expressly Reserved The Question Of When Constitutional Constraints Prevent The Government From Dismissing A Qui Tam Action. Day Presents That Question.

The False Claims Act permits the Government to dismiss a qui tam action over the relator's objection but this authority is not unlimited. In *United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 437 (2023), the Supreme Court said that Government dismissal motions receive "substantial deference" but the Court grounded that deference in "bedrock constitutional constraints on Government action" and expressly reserved the question of when those constraints override deference.

> The Third Circuit suggested that Rule 41's standards "rest atop the foundation of bedrock constitutional constraints on Government action." So a hearing, whether pre- or post-answer, might inquire into allegations that a dismissal "violate[s] the relator's rights to due process or equal protection." But because Polansky has not raised a claim of that sort, we do not consider the circumstances in which, or procedures by which, a court should find the Constitution to prevent the Government from dismissing a qui tam action.
>
> *Id.* at 436 n.4.

This Court has already applied this framework. In *United States ex rel. Doe v. Credit Suisse AG*, 117 F.4th 155 (4th Cir. 2024), the Court affirmed dismissal only because the relator "ha[d] not raised any

colorable claim that his due process or equal protection rights have been violated." *Id.* at 161. Where no constitutional claim exists, the Government "merely needs to provide reasons" for dismissal and "[a]bsent some extraordinary circumstance, that sort of showing is all that is needed." *Id.* This Court acknowledged that constitutional claims warrant distinct treatment, noting that where a relator raises such a claim, the district court must inquire whether dismissal "violate[s] the relator's rights." *Id.* (quoting *Polansky*, 599 U.S. at 436 n.4).

Mr. Day raised precisely such a claim. Unlike the relator in *Credit Suisse*, who "only claimed error" because the Government sought dismissal "for reasons he disagree[d] with," *id.*, Mr. Day argued that the Government's conflict of interest violates due process itself. His Complaint alleged that the Government (through the DLA) was "knowingly complicit" in the false claims that the Government now seeks to protect from scrutiny. JA42. He moved to remove the United States or its counsel as a party on conflict-of-interest grounds. JA45. He argued that due process prohibits a conflicted representative body from extinguishing claims alleging its own misconduct. JA288. This is the sort of constitutional claim that *Polansky* reserved. The question is not

whether the Government may dismiss qui tam actions generally, but whether the Constitution permits dismissal when the Government's institutional self-interest to defend ultra vires activity undermines a dismissal decision. *Polansky* acknowledged that such a question may undermine the Government's right to a dismissal. If any case qualifies as so "exceptional" that a dismissal should be denied, *id.* at 437, it is one where the Government seeks to bury allegations of its own complicity to unlawful procurement practices.[2]

The answer to *Polansky*'s reserved question is found in *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987), which holds that due process and the court's supervisory authority require disinterested prosecution when those acting in the Government's name are compromised by conflict.

### B. The Government's Investigation Was Constitutionally Inadequate Because It Consisted Of Asking The Allegedly Complicit Agency Whether It Did Anything Wrong.

---

[2] The Government's initial showing in this case was so deficient that the leading FCA treatise cites it as the principal example of when dismissal should be denied under *Polansky*. *See* John T. Boese & Douglas W. Baruch, *Civil False Claims and Qui Tam Actions* § 4.05[A][1] & n.24 (6th ed. 2025) (citing *United States ex rel. Day v. Boeing*, No. 3:23CV371, 2024 WL 2978469 (E.D. Va. June 13, 2024)).

The Complaint alleges that the DLA is "knowingly complicit" in the procurement of false claims. (ECF 24 at 12). This is not an allegation that a rogue contractor defrauded an innocent Government, but that the Government itself participated in the scheme and fostered the defendants' false claims. The Complaint alleges the DLA's personnel knew these procurements were sole-sourced but labeled them as competitive anyway. JA13. When the Government moved to dismiss the allegations, it represented that it conducted an "investigation" and, though the Relator's factual description of the scheme is accurate, it determined that the Relator's allegations as to legality "are without merit." JA61.

The Government's "investigation" thus consisted of asking the complicit agency, one that it also represents, as to whether it did anything wrong. The agency denied wrongdoing as a matter of law. On that basis, the Government moved to dismiss a case alleging over $100 billion in fraud.

This is precisely the danger *Young* identified. The Government's discretionary decisions, including "what methods of investigation should be used, what information will be sought as evidence," were made

"outside the supervision of the court" and are inherently infected by the institutional self-interest of defending the agency that has been inculpated. 481 U.S. at 807. The DLA has every incentive to characterize its own conduct as "legitimate" and the DOJ defended this self-serving characterization without analysis. The district court recognized the problem.

Judge Payne observed that the question at issue was "simple to investigate." "If I had been getting a complaint like this and it said you're using this system and you're doing it knowing it's illegal, the first thing I would have investigated is, well, is that system illegal as the complaint alleges?" JA306. He was "taken aback" that the Government could not determine whether it had examined the regulatory question. JA309. He even suggested the Government "wrote [Day] off as a naysayer or problem child" rather than taking his allegations seriously. JA309. Despite these deficiencies, the court granted the Government's dismissal motion because it determined that it does not have the authority to order the United States to appoint independent counsel. That deference was constitutionally unwarranted. In assessing dismissal motions, courts must "endeavor to ensure that substantial justice is accorded to all

parties." *Polansky*, 599 U.S. at 437 (quoting 9 Wright & Miller's Federal Practice & Procedure § 2364, at 554 (4th ed. 2022)). A court cannot ensure substantial justice by deferring to a Government whose only "investigation" consisted of asking the allegedly complicit agency to clear itself.

The Government also conceded the factual predicate for Mr. Day's allegations. Counsel admitted that the DLA confirmed "they do have, in some cases, one approved source" and that "there is kind of a limited source for where the parts can be obtained." JA312. But the Government's legal conclusion came from the DLA's own lawyers, the very people whose conduct is at issue. Under *Marshall*, "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision." 446 U.S. at 249–50. An agency's interest in avoiding liability for its own allegedly unlawful conduct is the paradigmatic "impermissible factor" *Marshall* warned against. It infected the only investigation that occurred and shaped the Government's litigation posture from the outset.

The conflict here is not attenuated. In *Sigillito*, the Eighth Circuit found no actual conflict where a prosecutor's cousin was a witness but the prosecutor himself did not participate in the case. 759 F.3d at 928. Here, the allegedly conflicted actor, DLA, directly controlled the investigation's conclusions. The DLA's lawyers provided the only substantive input into the Government's decision to seek dismissal. That is not a tangential relationship. It is dispositive control by the conflicted party over the enforcement decision. Because this is a structural error, Mr. Day need not demonstrate that a disinterested investigation would have reached a different conclusion. The conflict itself is the constitutional violation.

### C. The District Court Applied An Incomplete Legal Framework By Failing To Consider *Young*, Its Fundamental and Inherent Supervisory Authority, and The Constitutional Exception *Polansky* Acknowledged.

The district court recognized something was wrong but ultimately did not believe that it had the authority to provide the remedy requested. Admittedly, this is a novel issue and a case of first impression warranting this Court to reverse and remand with guidance to the district court affirming that it can do what is necessary in the name of due process.

Judge Payne acknowledged "some concern that the rule ought to be otherwise where, as here, it is alleged that the United States and contracting party defendants have conspired and colluded in the making of false claims." JA157 n.11). Nevertheless, the district court analyzed Mr. Day's conflict argument through the lens of individual attorney disqualification under state ethics rules rather than institutional conflicts as in *Young*. The error is apparent in the court's framing.

The court faulted Mr. Day for failing to "name a specific lawyer who would purportedly possess a conflict of interest," JA160-161, and noted that "only AUSA McIntosh is recorded as counsel for the United States" and Mr. Day did not allege "any purported conflict of interest on behalf of Mr. McIntosh (or any other attorney for the United States) specifically." JA161. Mr. Day actually did identify the conflicted lawyer—the Attorney General of the United States and therefore the entire Department of Justice. *Young* does not require identifying a conflicted individual as the Court addressed situations where the institution's interests distort discretion, regardless of any individual attorney's personal stake. The question is not whether Mr. McIntosh or the U.S. Attorney for the Eastern District of Virginia have an independent or

personal conflict. The question is whether the Department of Justice is conflicted due to its role to protect the DLA's interests in avoiding liability and defend its actions. That is the structural question that *Young* answers.

The district court also held that Virginia Rule of Professional Conduct 1.7(a) was inapplicable because the DOJ represents only "one client," the United States.

> The Attorney General, and through him, the DOJ, represents the interests of the United States as a whole. The United States, including its Treasury and all of its other agencies and employees, is a single client.... Therefore it is logically incongruent to claim that the DOJ's representation of different entities of the United States creates a conflict of interest.
>
> JA164-165.

This framing misconstrued the *Young* problem. The issue is not *multiple* clients but whether the single client's institutional self-interest distorts the necessarily independent judgment to advance the interest of the United States as declared and required by Congress in the False Claims Act. The DLA's interest in avoiding liability is an interest of the United States and thereby an interest that the DOJ represents. Those interests come in direct contrast to the protection of the American

taxpayer and United States Treasury as Congress declared via the sole-source procurement laws and the purpose of the False Claims Act. The district court's "one client" framing does not resolve the conflict, it embodies it.

The cases the district court relied on were inapposite. It cited *Caggiano*, *Bolden*, *Vlahos*, *Hasarafally*, and others for the proposition that a single attorney's conflict cannot be imputed to an entire office. JA162–164). Every case in that catalogue involved *individual* conflicts—whether a single prosecutor's *personal* stake requires disqualifying colleagues who share no such stake. None address whether institutional conflicts affecting prosecutorial discretion require judicial intervention under *Young*. Those cases answer a different question than the one presented.

The court also faulted Mr. Day for citing netiher "statutory nor judicial authority" for the proposition that courts have power to address the conflicts at issue. JA161. This case is a first impression and there is no on-point FCA case precedent explicitly supports or undermines Mr. Day's or the Government's position taken in this case. That is likely due to the fact the Government rarely is exposed for being a co-conspirator in

a false claims scheme in violation of federal law. Nevertheless, *Young* is an overarching authority that answers the question presented albeit indirectly. The district court's failure to consider *Young* resulted in an incomplete analysis that asked the wrong questions and applied the wrong framework. Courts have a supervisory authority to ensure disinterested prosecution of the law, yet the district court did not consider the constitutional exception that *Polansky* expressly reserved or whether the Government's admissions supplied the facts that the court claimed as missing. This analytical gap was not an isolated error. In June 2024, the district court recognized the Complaint alleged Government complicity, observing that the complaint "alleges that the Government procurement agencies were knowingly complicit" in the fraud. JA42. The district court stated this was "worse still," JA42, yet its analysis asked only whether the Government satisfied *Polansky*'s procedural requirements, not whether the complicity and conflict allegation triggered the exception *Polansky* acknowledged. The result was a dismissal that the district court considered troubling but deemed itself

lacking precedent to authorize a different result.[3] This Court must signal otherwise.

### III. The District Court Erred When It Granted The United States' Motion To Dismiss And Denied The Relator's Motion Filed Pursuant To Fed. R. Civ. P. 59(e) In Spite of The Attorney General Having Not Filed A Written Consent With A Statement of Reasons As Required Per 31 U.S.C. § 3730(b).

"On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first of this court, and then of the court from which the record comes." *Steel Co. v. Citizens for a Better Environment*, 523 US 83, 94 (1998). In the district court's memorandum

[3] Day preserved this constitutional claim below. His counsel cited *Marshall v. Jerrico* by name, handed the court a physical copy of the opinion, and articulated the due process principle that executive action requires "an impartial and disinterested" decisionmaker. JA288. Counsel argued that the Government was "not a disinterested and neutral third party of the United States acting in this case" because DOJ was "claiming and defending ultra vires actions of its own accord, that being the DLA" while simultaneously moving to dismiss claims alleging those actions. JA288-289. Counsel also requested appointment of "independent counsel or some other third party" as a remedy. JA90. *Young* applies the *Marshall* principle to prosecutorial conflicts. Because Day raised the constitutional claim *Young* addresses and requested the remedy *Young* authorizes, the argument is preserved. *See Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below."). The district court addressed Day's conflict argument on the merits JA157-178, foreclosing any suggestion of forfeiture.

opinion on the Appellant's motion to amend judgment pursuant to Rule 59(e), the lower court misinterpreted 31 U.S.C. §§ 3730(b)(1), (c)(2)(A), resulting in an order of dismissal without jurisdiction to have done so.

The statutory misinterpretation begins with the insertion of a word into 31 U.S.C. § 3730(b)(1) that does not exist and thereafter relied on this error to arrive at its dismissal sans jurisdiction. The word is "voluntary" (and its derivatives). Twice the lower court inserted this word into § 3730(b)(1) writing:

> [T]he Attorney General must consent to a *voluntary* dismissal brought by any qui tam plaintiff before the court may dismiss the action . . . .
>
> Attorney General must provide consent and reasons to support the *voluntary dismissal* of a qui tam complaint.
>
> JA234-236.

Title 31 U.S.C. § 3730(b)(1) does not contain the word "voluntary." The relevant portion of provides: "The action may be dismissed *only if* the court and the Attorney General give consent to the dismissal and their reasons for consenting." *Id*. As the lower court found at page 50 of Doc. 58: "Now, this provision applies whether the United States has decided to intervene in the action pursuant to 31 U.S.C. § 3730(c) or not." *Id*. Section 3730(b) defines the general process for dismissal of a qui tam civil

action for violation of § 3729. Any further reference to dismissal in § 3730 is defined and governed by the process of § 3730(b) with its judicial jurisdictional limitation.

Section 3730(c)(2)(A), with its "may dismiss" language, refers to the dismissal process already defined by 3730(b). This is why Congress expressly used the language "the action may be dismissed *only if* the court and the Attorney General consent . . ." in § 3730(b). There are not two distinct processes for dismissal in a qui tam civil action for violation of § 3729. There is one dismissal process defined in § 3730(b) and if the Government decides to move for dismissal of the action, the § 3730(c)(1)(A) motion for dismissal is controlled by the process defined in § 3730(b)(1).

Section 3730(b) is the "how to" for dismissal. Congress differentiated between the "Attorney General" and its role and the "Government" and its right to move for dismissal. Section 3730(c)(2)(A) does not provide an automatic right of dismissal for the Government but it is the Government's right to move for dismissal as defined in § 3730(b) and the Relator's right to have a hearing to object to the Government's motion to dismiss. Nowhere in these statutes does it state that the

language of "only if" in § 3730(b) is null and void merely because the Government decided to move to dismiss the case according to § 3730(c)(2)(A).

The district court's misinterpretation of § 3730(b) as the "general context" dismissal, JA246, and (c) as the "specialized dismissal procedures" is antithetical to the logic and text of these statutes. Section 3730(c)(2)(A) states:

> The Government *may* dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion.

*Id*.

The text of § 3730(c)(2)(A) itself allows the Government to move for dismissal as defined in § 3730(b). This Government's motion is to be given some deference by the Court but it remains a motion, not an automatic dismissal right. Upon the Government's filing of a motion per § 3730(c)(2)(A), the Relator receives the right for both a hearing and the § 3730(b)(1)'s requirement that the Attorney General consent with the Government's reasons for the motion. Without either of these, the court cannot dismiss the action. Nowhere in § 3730(c) does it state that the

"only if" language of § 3730(b)(1) is not in effect or that § 3730(c)(2)(A) overrides § 3730(b)(1).

The district court's addition and reliance on words that do not exist in the statute is the epitome of statutory misinterpretation and an error of law. There is one dismissal process defined in § 3730. If the Government moves to dismiss without the Attorney General's consent and statement of reasons, the court does not have jurisdiction to grant the motion. Congress explicitly disallowed it.

Because the Government did not provide the district court with the Attorney General's written consent to dismiss the case and with her reasoning, the lower court did not have the authority to dismiss the case per § 3730(b). This case should be remanded for further proceedings based on the Attorney General's input.[4]

---

[4] The Relator argued to have the DOJ disqualified for conflict of interest after the district court ordered such briefing. There is no inconsistency in the position of the need for the Attorney General's written contest with reasons in support of the motion to dismiss and the Relator's motion for the Department of Justice to be disqualified, as the Attorney General could, and very possibly will, not allow the U.S. Attorney's Office for the Eastern District of Virginia to "catch and kill" the action while ignoring the Take Care Clause.

## IV. The District Court Erred By Dismissing The Case On Rule 9(b) Grounds.

The Complaint in this case is predicated on the fact that the Defendants engaged in false claims, not "fraud." Rule 9(b) is inapplicable and the Government did not proceed on a Rule 9(b) basis when asking for the case to be dismissed. The district court erred as a matter of law when dismissing the case after finding that the Complaint failed to satisfy Rule 9(b)'s heightened pleading requirements for fraud cases. The requirements are governed by 31 U.S.C. § 3729, not traditional fraud. Additionally, the Government did not raise the issue of Rule 9 pleading standards and the Relator did not have a fair opportunity to defend the issue on the merits. As a result, that basis for dismissal also warrants vacating the order, reversal, and a remand to the district court.

Conclusion

WHEREFORE, Mr. Roger C. Day, Jr., the Relator-Appellant, respectfully requests for this honorable Court to HOLD that the district court erred when it determined that it does not have the authority to order the appointment of an independent counsel to represent the United States should a conflict of interest exist, HOLD

that such conflict does exist and that dismissal of the case at the behest of conflicted representation is a violation of the Relator's right to due process, HOLD that the Court erred by dismissing the case without the written consent of the Attorney General with stated reasons in support, HOLD that the Court erred by applying Fed. R. Civ. P. 9's heightened pleading standards and dismissing the case, REVERSE and VACATE the district court's order dismissing the case and REMAND the case to the district court for further proceedings in furtherance of this Court's decision.

Respectfully submitted,

/s/ Elliott M. Harding, Esq.
Elliott M. Harding, Esq.
VSB No. 90442
Counsel for Relator-Appellant
Harding Counsel, PLLC
2805 Meadow Vista Dr.
Charlottesville, VA 22901
Tel: (434) 962-8465
E: Elliott@HardingCounsel.com

## Certificate of Compliance

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10395 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

Respectfully submitted,

/s/ Elliott M. Harding, Esq.
Elliott M. Harding, Esq.
VSB No. 90442
Counsel for Relator-Appellant
Harding Counsel, PLLC
2805 Meadow Vista Dr.
Charlottesville, VA 22901
Tel: (434) 962-8465
E: Elliott@HardingCounsel.com

## Certificate of Service

I hereby certify that I electronically submitted the foregoing document with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit using the electronic case filing system of the court on January 12, 2026.

I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

Respectfully submitted,

/s/ Elliott M. Harding, Esq.
Elliott M. Harding, Esq.
VSB No. 90442
Counsel for Relator-Appellant
Harding Counsel, PLLC
2805 Meadow Vista Dr.
Charlottesville, VA 22901
Tel: (434) 962-8465
E: Elliott@HardingCounsel.com